IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


CHRISTINE T. HO,

               Plaintiff,

   v.

JO ANNE B. BARNHART, Commissioner of Social
Security,

               Defendant.

CV 04-1856-ST

FINDINGS AND
RECOMMENDATION

STEWART, Magistrate Judge:

## **INTRODUCTION**

Plaintiff Christine T. Ho ("Ho") brings this action for judicial review of a final decision

of the Commissioner of Social Security denying her application for Social Security disability

insurance benefits ("DIB") under Title II of the Social Security Act. The court has jurisdiction

under 42 USC § 405(g). The Commissioner's decision should be reversed and remanded for an

award of benefits.

**BACKGROUND**

Ho was born in 1965. Tr. 124.[1] A native of Vietnam, she came to the United States when she was 10 years old, acquired English as a second language and earned a bachelor's degree in business administration. Tr. 235-36. Through 1994, Ho worked as a waitress in a cafeteria, retail sales clerk, clerk cashier and bookkeeper. Tr. 585, 601. After that, she attempted a home travel agency business but never attained gainful wages. Tr. 585. Ho was injured at work on August 23, 1992, by falling backwards off a stool, hitting her upper back and scapular region against a shelf and landing on her low back/posterior pelvic region. Tr. 207, 221. In January 1994, she had another injury when she stooped to pick up several shoe boxes that had fallen and hit her in the face. Tr. 221.

Ho alleges she has been disabled continuously since September 1, 1994, when she stopped working. Tr. 46. A claimant seeking DIB under Title II must show that the disability commenced during a period in which she had "insured status" under the program. 42 USC § 416(i)(3). Ho's last insured date is December 31, 1999. Tr. 40. Accordingly, the relevant period for Ho's claim is from her alleged onset of disability on September 1, 1994, to December 31, 1999. She was 29 years old at the beginning of the relevant period and 34 years old when her "insured status" expired.

Ho claims that since January 1994, she has experienced constant aching, stiffness, cramping and sharp pain in her shoulders, neck, upper and lower back, hips, knees, inner and outer elbows, wrists and chest due to fibromyalgia, as well as an inability to focus, maintain attention and remember short term. *Id.* She states that she must rest one hour at a time three

---

[1] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed with the Commissioner's Answer (docket # 5).

times a day, usually laying on ice or applying heat, and that her pain increases when she sits more than 30-60 minutes, stands more than 10 minutes, walks, reaches, bends and suffers emotional stress.

On January 29, 2002, after a hearing held on December 12, 2001, the Administrative Law Judge ("ALJ") issued a decision unfavorable to Ho. Tr. 42-57. On August 15, 2003, the Appeals Council remanded the case back to the ALJ for consideration of the weight given to the medical evidence, clarification of Ho's residual functional capacity, and further matters. Tr. 32, 95-97. A supplemental hearing was held on May 24, 2004, and on July 16, 2004, the ALJ issued a second unfavorable decision. Tr. 29-39. On November 5, 2004, the Appeals Council denied a request for review of the ALJ's decision. Tr. 21-23. The Council received more evidence and on January 11, 2005, found no reason to reopen and change the prior determination. Tr. 8-9. Ho requests judicial review of the final administrative decision, asking the court to find she is entitled to receive DIB.

## DISABILITY ANALYSIS

The initial burden of proof rests upon the claimant to establish disability. *Roberts v. Shalala*, 66 F3d 179, 182 (9th Cir 1995). To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 USC § 423(d)(1)(A).

The Commissioner has established a five-step sequential process for determining whether a person is disabled. *Bowen v. Yuckert*, 482 US 137, 140 (1987); 20 CFR § 404.1520. If the

claimant is found to be disabled at any step, it is not necessary for the Commissioner to proceed to the remaining steps.

In step one, the Commissioner determines whether a claimant is engaged in "substantial gainful activity." The claimant is not disabled if he or she is able to engage in substantial gainful activity. *Yuckert*, 482 US at 140; 20 CFR § 404.1520(b).

In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments." *Yuckert*, 482 US at 140-41. An impairment is severe within the meaning of the Act if it significantly limits the claimant's physical or mental ability to do basic work activities. 20 CFR § 404.1520(c). If the claimant is not severely impaired within the meaning of the Act, the claimant is not disabled.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert*, 482 US at 140-41; 20 CFR § 404.1520(d). These are listed in 20 CFR Part 404, Subpart P, Appendix 1 ("Listing of Impairments"). If the claimant's condition meets or equals one of listed impairments, then the claimant is conclusively presumed to be disabled. *Yuckert*, 482 US at 141.

In step four, the Commissioner determines whether the claimant can perform work he or she has done in the past. 20 CFR § 404.1520(e). To make this determination, the ALJ must assess the claimant's residual functional capacity ("RFC"). The claimant's RFC is an assessment of the sustained work-related activities the claimant can still do on a regular and continuing basis, despite his or her limitations. 20 CFR § 404.1545(a); Social Security Ruling

("SSR") 96-8p.  If the claimant can perform work he or she has performed in the past, then the claimant is not disabled.

In step five, the Commissioner must use the RFC to determine if the claimant can perform other work that exists in the national economy.  *Yuckert*, 482 US at 141-42; 20 CFR § 404.1520(e), (f).  If the Commissioner meets this burden, then the claimant is not disabled.  20 CFR § 404.1566.

## THE ALJ's FINDINGS

At step one, the ALJ found that Ho did not engage in substantial gainful activity during the time relevant to this matter.  Tr. 33.  At step two, the ALJ found that Ho has only one severe impairment, namely fibromyalgia.  *Id.*  At step three, the ALJ found that Ho's severe impairment did not meet or equal any listed impairment.  *Id.*  As a result, the ALJ proceeded to determine whether Ho had retained the RFC to perform past relevant work (step four) or other work existing in significant numbers (step five).  The ALJ found Ho's statements regarding her impairments and their impact on her ability to work "not entirely credible in light of information contained in the medical reports and elsewhere in the record."  Tr. 34.

The ALJ found that through December 31, 1999, when Ho's "insured status" expired, she retained the RFC "to lift and carry 15 pounds occasionally, and nothing over that weight," "should have no repeated bending or twisting, and no sustained stooping," and "was restricted from overhead reaching or pushing/pulling of heavy objects."  Tr. 39.  Based on that RFC, he concluded at step four that Ho is unable to perform her past work.  Tr. 37, 39.  At step five, the ALJ found that Ho retains the RFC to perform other work in the national economy.  He identified examples of such work drawn from the testimony of the impartial vocational expert

("VE"): order clerk, auto clerk, hand packager and information clerk. Tr. 39. Accordingly, the ALJ concluded that Ho was not disabled during the relevant period and not entitled to receive DIB.

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record. 42 USC § 405(g); *Andrews v. Shalala*, 53 F3d 1035, 1039 (9th Cir 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. *Martinez v. Heckler*, 807 F2d 771, 772 (9th Cir 1986) (citations omitted). The Commissioner's decision must be upheld, even if the evidence is susceptible to more than one rational interpretation. *Andrews*, 53 F3d at 1039-40. If substantial evidence supports the Commissioner's conclusion, the Commissioner must be affirmed; "the court may not substitute its judgment for that of the Commissioner." *Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001).

## DISCUSSION

Ho challenges the RFC assessment by contending that the ALJ: (1) improperly found she did not suffer from a severe mental impairment or somatoform disorder at step two; (2) failed to determine whether the combined conditions meet or equal a listing at step three; (3) erroneously discredited Ho's testimony as to the severity of her symptoms at step five;

(4) improperly rejected the treating doctor's opinion; and (5) applied improper standards for addressing vocational limitations.

This court concludes that the ALJ erroneously discredited Ho's testimony and improperly rejected the opinions of her treating doctors as to fibromyalgia. Because these errors are dispositive, the court need not address the other alleged errors.

## I.      Post-Hearing Evidence

Certain evidence, namely a November 28, 2004 report from Mustaquim Chowdhury, MD, was not before the ALJ, but was first presented in Ho's request for reconsideration before the Appeals Council. Tr. 10-20. When the Appeals Council considers materials not seen by the ALJ and concludes that the materials provide no basis for review of the ALJ's decision, a reviewing court may take into account the additional materials when determining whether substantial evidence supports the Commissioner's decision. *Ramirez v. Shalala*, 8 F3d 1449, 1451-52 (9th Cir 1993). Here, the Appeals Council reviewed Dr. Chowdhury's post-hearing opinion and found it did not provide a basis for changing the ALJ's decision. Tr. 8-9. Thus, this court will review the entire record, including Dr. Chowdhury's post-hearing opinion.

## II.     Whether the ALJ Improperly Discredited Ho's Testimony

Ho contends that at step five, the ALJ erroneously discredited her testimony as to the severity of her symptoms of fibromyalgia.

### A.      Legal Standard

When deciding whether to accept the subjective symptom testimony of a claimant, the ALJ must perform a two-stage analysis. In the first stage, the claimant must: (a) produce objective medical evidence of one or more impairments; and (b) show that the impairment or

combination of impairments could reasonably be expected to produce some degree of symptom. *Smolen v. Chater*, 80 F3d 1273, 1281-82 (9th Cir 1996) (citations omitted). The claimant is only required to produce objective medical evidence of the impairment, not of the symptom itself, the severity of the symptom or the causal relationship between the impairment and the symptom. *Id* at 1282. The claimant is also not required to show that the impairment could reasonably be expected to cause the severity of the symptom, but only to show that it could reasonably have caused *some* degree of the symptom. *Id* (emphasis added).

In the second stage of the analysis, the ALJ must assess the credibility of the claimant's testimony regarding the severity of the symptoms. To determine whether subjective testimony is credible, the ALJ may rely on:

> (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.

*Smolen*, 80 F3d at 1284 (citations omitted).

The following factors must also be considered: the circumstances under which the claimant testified, any contradictions or corroborations, the claimant's prior work record, the nature of any symptoms and medical treatment, her daily activities, and any other factors concerning the claimant's functional limitations and restrictions. 20 CFR § 404.1529 and SSR 96-7p, 1996 WL 374186, *3. In weighing evidence of pain, the ALJ is also required to consider the "nature, location, onset, duration, frequency, radiation, and intensity of any pain," "precipitating and aggravating factors such as movement, activity, environmental conditions," "type, dosage effectiveness, and adverse side-effects of any pain medication," "treatment, other

than medication, for relief of pain," "functional restrictions" and "the claimant's daily activities." SSR 88-13, 1988 WL 236011, **3-4.

"[O]nce a claimant produces objective medical evidence of an underlying impairment, an [ALJ] may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain." *Bunnell v. Sullivan*, 947 F2d 341, 345 (9th Cir 1991) (*en banc*). "While subjective pain testimony cannot be rejected on the sole ground that it is not corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and *its disabling effects*." *Rollins v. Massanari*, 261 F3d 853, 857 (9th Cir 2001), citing 20 CFR § 404.1529(c)(2) (emphasis added).

If the ALJ finds the claimant's pain testimony is not credible, the ALJ '"must specifically make findings which support this conclusion" and the findings "must be sufficiently specific to allow a reviewing court to conclude the [ALJ] rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit" it. *Bunnell*, 947 F2d at 345 (internal quotations and citations omitted). If there is no evidence of malingering, the ALJ may reject symptom evidence only if he gives clear and convincing reasons, including which testimony is not credible and what facts in the record lead to that conclusion. *Smolen*, 80 F3d at 1281, 1284; *Reddick v. Chater*, 157 F3d 715, 722 (9th Cir 1998) (citation omitted).

**B.     Analysis**

Ho satisfied the first stage of the analysis by presenting objective medical evidence of fibromyalgia which could reasonably be expected to produce some degree of the symptoms she described. Fibromyalgia, previously called fibrositis, is "a rheumatic disease that causes

inflammation of the fibrous connective tissue components of muscles, tendons, ligaments, and other tissue." *Benecke v. Barnhart*, 379 F3d 587, 589 (9th Cir 2004) (citations omitted).  The cause of fibromyalgia is unknown, and the "disease is diagnosed entirely on the basis of patients' reports of pain and other symptoms." *Id* at 590.  While The American College of Rheumatology has approved a set of agreed-upon diagnostic criteria, there are no laboratory tests to confirm the diagnosis (*id*) or the severity of the diagnosis. *Jordan v. Northrop Grumman Corp. Welfare Benefit Program*, 370 F3d 869, 872-73 (9th Cir 2004).  Among the agreed-upon diagnostic criteria are "generalized pain and multiple painful regions . . .  Sleep disturbance, fatigue, and stiffness are the central symptoms, though not all are present in all patients.  The only symptom that discriminates between it and other syndromes and diseases is multiple tender spots, which we have said were eighteen fixed locations on the body that when pressed firmly cause the patient to flinch." *Id* at 872 & n1-4 (internal quotations and citations omitted).  "Treatments for fibromyalgia include cold and heat application, massage, exercise, trigger-point injections, proper rest and diet, and medications such as muscle relaxants, antidepressants, and anti-inflammatories." *Brosnahan v. Barnhart*, 336 F3d 671, 672 n1 (8th Cir 2003), citing Jeffrey Larson, *Fibromyalgia*, in *2 The Gale Encyclopedia of Medicine* 1326-27 (Jacqueline L. Longe *et al.*, 2nd ed 2002).

However, at the second stage of the analysis, the ALJ found that Ho's statements "concerning her impairments and their impact on her ability to work are not entirely credible in light of information contained in the medical reports and elsewhere in the record."  Tr. 34.  He concluded that Ho has "some limitations in functioning, but not to the point of disability," based on medical reports and on "other evidence."  Tr. 36.  The "other evidence" was that she "told

Dr. Harris that she drove her kids to school, cleaned up the dishes, worked out at a gym, and shopped" and "told Dr. Wood in March 2003 that she socialized with her family, did a full range of housework, shopping and getting out and about." Tr. 36. He also noted that Ho "had a home-based travel agency for several years, which was not substantial gainful activity but showed that she had some ability to function with others" and that she had "delivered two healthy children during the time relevant to this matter, without apparent difficulty." *Id.*

While the ALJ stated that certain evidence "suggest[s] that she may be malingering," (Tr. 35), he did not expressly make a finding of malingering. Therefore, the issue is whether the ALJ provided clear and convincing reasons to discredit Ho's testimony. This court concludes that he failed to do so.

### 1. **Ho's Daily Activities**

With respect to Ho's daily activities, the ALJ based his conclusion primarily on statements Ho had made to Dr. James Harris, MD, MSPH, and Dr. Joe Wood, Psy D. However, his summary of Ho's statements is not entirely accurate.

Dr. Harris examined Ho in February 2004 for the state Disability Determination Services to determine her ability to do work-related activites. Tr. 513-21. Ho described to Dr. Harris her activities the day before as follows:

> She drove her kids to school and after that came home to rest and clean up the breakfast dishes, etc. She then went to the gym for her workout. She goes to the 24-Hour Fitness on Murray. This fitness program has been recommended by a physical therapist. She was in the hot tub, she walked in the swimming pool for five or ten minutes, she was in the sauna, and the walked on the treadmill for five or ten minutes. She then stopped and bought Valentine's Day cards on the way home and got home around 3:00. She rested until her husband came home shortly to help take care of the kids.

Tr. 514.

In contrast, the ALJ's summary deleted Ho's rest periods and ignored the minimal scope of her workout at the gym and shopping trip.

Similarly, the ALJ's summary of Ho's statements to Dr. Wood is not accurate. Dr. Wood examined Ho in February 2004 (not March 2003) for the Disability Determination Services in order to evaluate her fibromyalgia and sleep disorder. Tr. 522-26. He recorded Ho's daily activities as follows:

> The claimant goes to bed at 10:30 pm and awakes at approximately 7:30 am. She does not eat breakfast. In the morning, she helps her children get ready for school, cleans up, rests and then picks up her younger son from school. She has lunch at about noon. She plays with her son and sometimes rests. At about 3:00 pm, she helps her children with homework. She rests until 5:30 pm, and then she and her spouse cook dinner. She has dinner at about 6:00 pm. After dinner, she gets the children dressed for bed and reads to them.

Tr. 523-24.

Dr. Wood did not report, as the ALJ stated, that Ho socialized with her family, did a full range of housework, shopped, and got out and about. Once again, the ALJ ignored Ho's frequent rest periods and minimal physical activity.

Ho's statements to Dr. Harris and Dr. Wood are consistent with her testimony at the 2002 administrative hearing and Pain Questionnaire dated October 29, 2000, that she suffers constant pain and can only sit 30-60 minutes and stand about 10 minutes at a time. Tr. 160, 164, 562. If she had to perform a job where she had to alternate sitting for 30 minutes and standing for 10 minutes, she could but would then flare up at night, get heavy legs "[l]ike I'm paralyzed" and might have to be in bed or feel really tired the next one or two days. *Id.* Rating her pain on a scale from 1 to 10, the average was about 7 or 8 and had worsened since 1999, when the average of the pain was about a 6 or 7. Tr. 566. To help alleviate the pain, she uses ice and heat several

times a day, has periodic acupuncture treatments, has received nerve block injections, and has taken numerous pain medications. Tr. 563-66, 575-76. She also has difficulty concentrating and remembering what she read, which meant she had to read everything over and over. Tr. 169, 576.

She may have delivered two healthy children, as noted by the ALJ, but also receives considerable help raising them from her family and can only perform minimal household chores. Tr. 161-62, 570-75. With respect to her attempt to run a home travel agency business, she explained that sitting and standing was a major problem due to muscle cramps in her neck and upper back. Tr. 559-60. Although the business was open for three years, it lost money since she could not take calls and help customers. Tr. 557. The record contains no contrary evidence.

Evidence that a claimant can do physical activities at a medium or light level for brief periods of time does not prove that he can sustain that level of work for a full eight-hour work day. *See Fair v. Bowen*, 885 F2d 597, 603 (rejection of plaintiff's testimony allowed only when a substantial part of plaintiff's day is spent performing household chores or other activities that are transferable to a work setting); *see also Smolen*, 80 F3d at 1284, n7 ("the Social Security Act does not require a plaintiff to be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferrable to a work environment where it might be impossible to rest periodically or take medication"). Nothing in the record indicates that Ho is able to spend a substantial part of her day performing activities that are transferrable to a work setting. Several daily hours of light activity with frequent rest period and the help of others is simply not equivalent to an ability to work full-time.

Thus, the reasons given by the ALJ for discrediting Ho's symptoms as the severity of her symptoms from fibromyalgia based on her daily activities are not clear and convincing.

## 2. Medical Reports

The ALJ also based his credibility decision on medical reports which "suggest that the claimant has some limitations in functioning, but not to the point of disability." Tr. 36. Although the ALJ summarized a number of medical reports in both his 2002 and 2004 opinions, he did not specifically explain on which ones he relied to discredit Ho. However, he clearly relied on those medical opinions which questioned the severity of Ho's reported symptoms. Because the record contains a conflict in the medical evidence, the analysis must focus on whether the ALJ gave the proper weight to the conflicting medical opinions.

As required by the Appeals Council, the ALJ assigned weight in his 2004 opinion to the various medical assessments discussed in his 2002 opinion. The ALJ gave "very substantial weight" to reports by Dr. Steven S. Andersen, two physical capacity evaluations, Dr. Barbara H. Hills, Dr. Shirley B. Ingram, Dr. David W. Rich and Dr. Djan M. Dordevich, all made during the time Ho was insured for disability purposes. Tr. 34. He gave "some weight" to the report by Dr. Anne Vetto, a treating physician in June and July 1995, because it was "not entirely supported." Tr. 34, 50. He gave "little weight" to the comments by Dr. David D. Panzer, a chiropractor, because he "is not an acceptable medical source and his comments are inconsistent with those from medical doctors." Tr. 34.

Although the ALJ summarized the medical reports by Dr. Thomas L. Lorish, Dr. Kelly D. Krohn and Dr. James K. Smith in his 2002 opinion, he did not assign them any weight. Tr. 47, 49, 51. He discussed but gave little weight to new exhibits containing medical reports by Dr.

Kaur-Jayaram and Dr. Chowdhury, both of whom treated Ho after 2001. Tr. 34-35. He also discussed and considered the consultative examination in February 2004 by Dr. Harris, although it was a "half-decade" after Ho's insured status expired and after "multiple intervening accidents." Tr. 35.

With respect to those medical opinions to which the ALJ gave "very substantial weight," several were before Dr. Ingram diagnosed Ho with fibromyalgia in 1995. Dr. Andersen did one physical and neurological examination on March 28, 1994, shortly after her second injury, and found "chronic thoracic and lumbar back pain without evidence of root problems." Tr. 209. The Physical Capacity Evaluation dated April 4, 1994, found that Ho had few limitations and noted "some signs of inconsistent and less than full effort" with Ho appearing "reasonably comfortable throughout the evaluation in spite of her verbal reports of pain and discomfort." Tr. 211. Based on a neurological consultation on September 8, 1994, Dr. Hill concluded that Ho was able to return to work full-time in the light duty capacity. Tr. 217.

However, on May 15 and May 24, 1995, Dr. Ingram, a rheumatologist who treated Ho, found that Ho had a "[l]arge right humerus lesion, etiology unknown," which needed further evaluation. Tr. 224. On July 30, 1995, Dr. Ingram diagnosed Ho with fibromyalgia, "which is a condition of axial skeletal and muscular aching, stiffness, poor ability to condition the muscles, and chronic fatigue." Tr. 227. On August 2, 1995, on the basis of objective tests and response to medication, Dr. Ingram excluded the earlier diagnosis of "inflammatory arthritic process." Tr. 309. She prescribed amitriptyline, routine stretching and conditioning, and stated that fibromyalgia patients "certainly can be disabled from manual labor-intensive work; however, it

is reasonable within a few months for them to be working part time at sedentary work, and indeed this seems to speed their recovery." Tr. 228.

After a two-year break, Ho went to see Dr. Ingram again on March 5, April 16, and June 18, 1997, who reiterated her diagnosis of fibromyalgia. Tr. 305-308. She found that the fibrositic tender points were diffusely positive. Tr. 306. Dr. Ingram reassured Ho that all her symptoms fit her diagnosis very appropriately and that February 1997 lab work was negative for rheumatoid factor and ANA. Tr. 305. She prescribed Azulfidine, Zantac, and advised Ho to perform warm pool exercises. Tr. 306. Although Dr. Ingram saw Ho multiple times for a period of two years, she never questioned Ho's credibility concerning the severity of her reported symptoms.

On December 1, 1995, Dr. Dordevich, another examining physician to whom the ALJ assigned "very substantial weight," conducted an independent medical evaluation of Ho, noting that Ho had "[s]ubjective complaints of discomfort, cervical spine, upper, middle and lower back," with no objective findings present and no evidence of neurological, orthopedic, rheumatological disorder or medical illness present. Tr. 246. He concluded that Ho is "fixed and stable and capable of full-time employment in her regular duty at Nordstrom." *Id.* He attributed her musculoskeletal complaints to the normal aches and pains of daily living, and not to any identifiable medical disorder. *Id.* He believed that she could do any job she wanted to do and that "only psychosocial difficulties are preventing her from functioning without complaining." Tr. 247. When asked specifically about fibromyalgia, Dr. Dordevich again emphasized that Ho has no identifiable medical condition, *id,* and that other doctors' diagnoses

of fibromyalgia were based on subjective complaints, without any clinical criteria to establish the diagnosis. Tr. 246.

Paradoxically, the ALJ gave the same "very substantial weight" to both Dr. Dordevich's and Dr. Ingram's medical reports, although the two are directly contradictory. Dr. Dordevich found no identifiable medical condition due to the lack of objective testing and recommended full-time employment at her previous job, while Dr. Ingram diagnosed fibromyalgia and predicted it is reasonable for fibromyalgia patients to return to work only part-time in a sedentary position. Thus, despite his statements to the contrary, the ALJ actually gave little weight to Dr. Ingram's medical report.

Where the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record. *Lester v. Chater*, 81 F3d 821, 830 (9th Cir 1995) (citation omitted). The opinions of treating physicians are entitled to greater deference than those of examining physicians, which in turn are entitled to more weight than the opinions of non-examining physicians. *Id* at 830-31 (citations omitted). Because Dr. Ingram is a rheumatologist, her opinion is entitled to greater weight than Dr. Dordevich's, and even greater weight than those of other treating physicians, because "it is an opinion of a specialist about medical issues related to his or her area of specialty." *Benecke*, 379 F3d at 594 n4, citing 20 CFR § 404.1527(d)(5). Rheumatology is the specialty field for fibromyalgia. *Id* (citation omitted). The ALJ erred by offering no reason for rejecting the medical opinion of Dr. Ingram which is consistent with Ho's testimony. Furthermore, by relying on the medical opinion of Dr. Dordevich, the ALJ ignored

the well-recognized principle in the Ninth Circuit that fibromyalgia has no objective test to prove its existence or its extent.

The ALJ also assigned "very substantial weight" to a April 23, 1996 Work Capacity Evaluation which concluded that Ho is "minimally functioning in the Sedentary-Light Range of Physical Demand." Tr. 251. The evaluators observed that Ho "magnified her symptoms and gave less than a full effort" and appeared to "self-limit her performance," which made them "unable to determine her actual capacities." *Id.* They also noted that Ho tested positive for 3 out of 5 Waddell's test,[2] "demonstrated excessive straining behaviors with very low weight especially lifting overhead" and showed inconsistencies between her exercise heart rate and the high numerical level on the Berg test. Tr. 252-53. However, they also noted that Ho reported left shoulder pain when reaching overhead "and demonstrated appropriate pain behaviors." Tr. 253. Moreover, they concluded that Ho "does not demonstrate the requirement for lifting and standing with movement for seven hours/day. The longest she was observed to stand and move about during the examination was one hour at a time. She appeared very fatigued by the end of the evaluation." Tr. 254. Thus, this report in large part supports Ho's testimony.

Also given "very substantial weight" is the November 23, 1999, report by Dr. Rich, an examining neurologist, which noted "no abnormal objective findings" but "subjective complaints of pain in the upper and lower back [which] far outweigh anything to be found objectively.

---

[2] "The Waddell's test is a set of five maneuvers performed during a routine physical examination to identify patients in whom nonorganic issues play an important role in the persistence of symptoms." *White v. Barnhart*, 2004 WL 635732 *2 n2 (W D Wis Feb 23, 2004), *aff'd* 415 F3d 654 (7th Cir 2005), *citing* Waddell G, McCulloch JA, Kummel E, Venner RM, *Nonorganic physical signs in low-back pain*, Spine 1980; 5: 117-25. "Malingering is not the only conclusion to be drawn from the exhibiting of Waddell signs." *Hilmes v. Barnhart*, 118 Fed Appx 56, 61 (7th Cir 2004), *citing* Chris Main, Ph.D., and Gordon Waddell, D.Sc., M.D., *Behavioral Responses to Examination: A Reappraisal of the Interpretation of "Nonorganic Signs,"* 23 Spine 2367-2371 (November 1998) (abstract) (behavioral signs alone not a test of credibility or malingering).

There is evidence of symptom magnification." Tr. 351. Dr. Rich believed "her current complaints which she blames on sitting at a computer and operating the computer are far and above that which would be expected from such sedentary activity" and found "no abnormality to explain her multiple subjective complaints." Tr. 353. He diagnosed "1. history of contusion/strain of upper and lower back, 1992; with 2. marked somatization disorder." Tr. 351.

The ALJ also relied on the February 2004 examination by Dr. Harris who found that Ho's chronic pain syndrome has no identified pain generator. Tr. 513-15. He noted the severity of her pain was not consistent with the physical exam findings or imaging studies that had been performed and that Ho demonstrated "widely different ranges of motion during different parts of the exam." Tr. 515. For example, Dr. Harris pointed out that some of her motion was so limited that one would not expect her to be able to walk, dress or eat, and he believed parts of her exam were limited intentionally. *Id.* He found that she could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, that her walking, standing and sitting were not affected by the impairment, and that her pushing or pulling were affected by the impairment, but he believed they were primarily limited by her symptoms. Tr. 518-19. Dr. Harris believed Ho could occasionally perform various postural activities due to "near normal" strength and mobility, with limitations "based on symptoms of chronic pain." Tr. 519.

Contrary to these two reports by examining physicians which questioned Ho's credibility, none of the examining physicians Dr. Lorish, Dr. Krohn and Dr. Smith questioned Ho's credibility. The ALJ summarized but failed to assign weight to their reports. The reports by Dr. Krohn and Dr. Smith, both rheumatologists, corroborate Dr. Ingram's diagnosis of

fibromyalgia, although they do not opine about the effects of fibromyalgia on her activities. Tr. 230-33 (10/17/95 by Dr. Krohn); Tr. 362-63 (4/6/00 and 7/5/00 by Dr. Smith).

Furthermore, Dr. Kaur-Jayaram and Dr. Chowdhury, who began treating Ho in July 2000 and March 2001 respectively to relieve her pain and who treated her for multiple years, never questioned Ho's credibility.

After diagnosing, a "possible lumbar facet disease of traumatic etiology," Dr. Kaur-Jayaram gave Ho pain injections in July and August 2000 ( Tr. 382, 387), October and November 2000 (Tr. 448-49) and April 2, 2001 (Tr. 446). Besides injections, Dr. Kaur-Jayaram also prescribed Neurontin, increasing her dose after no obvious relief of the symptoms, suggested physical therapy and a TENS unit. Tr. 446-47. After Ho told Dr. Kaur-Jayaram in December 2001 that she "would really like to have her pain problem addressed in a slightly more aggressive manner at this point in time" (Tr. 465), she received additional trigger point injections in 2002 and 2003. Tr. 455-459, 462, 464, 469-73. On February 24, 2003, Ho returned to see Dr. Kaur-Jayaram and an examination revealed "multiple trigger points located in the parasinous muscles of the thoracic spine as well as in the muscles of the shoulder girdle and upper border of the trapezius," and normal range of motion in the lower back area, with "point tenderness located over the left lower lumbar facet joints." Tr. 460. Dr. Kaur-Jayaram assessed that Ho suffers from "myofascial pain of the left upper back" and "possible lumbar facet syndrome with associated myofascial overlay." *Id.*

On March 5, 2001, Ho became a patient of Dr. Chowdhury. Tr. 450. On December 7, 2001, Dr. Chowdhury wrote that Ho was diagnosed with fibromyalgia and chronic pain syndrome and "would benefit from the use of the specialized Tempur-Pedic bed." Tr. 450. On

October 30, 2002, he wrote that Ho "suffers great difficulty with bathing, cooking, bending, driving, walking, climbing stairs and reaching due to her sever[e] fibromyalgia." Tr. 485.[3]

On February 21, 2003, an MRI of the spine showed mild to moderate right lateral stenosis. Tr. 12. In October 2004, Dr. Chowdhury stated that Ho suffers from a "longstanding history of myofascial pain/fibromyalgia," and that the physical exam supports the diagnosis. Tr. 11. He also noted Ho is attending the pain clinic for treatment and has displayed "continuing symptoms of overwhelming pain." Tr. 11, 19. Dr. Chowdhury concluded that in his experience, Ho was "probably not" able to sustain concentration, persistence and pace for four two-hour segments, five days a week, with a 15-minute break after the first two hours, a 30-minute break after the second two hours, and a 15-minute break after the third two hours. Tr. 12. On a form, Dr. Chowdhury opined that Ho was not capable of performing sustained sedentary work or light work on a regular and continuing basis, *i.e.*, eight hours a day, five days a week, or an equivalent work schedule. Tr. 14, 18. He excluded from consideration all limitations which he believed resulted from the patient's conscious malingering of symptoms, if any. *Id.* He rated as "severe" Ho's ability to perform activities within a schedule, maintain regular attendance, be punctual, complete a normal workday and workweek without interruptions from medically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. *Id.* He believed that even if Ho had the freedom to alternate sitting and standing during the work day, she would still be limited as indicated above. *Id.*

---

[3] When asked to provide an apportionment of Ho's condition as of November 2002 related to Ho's cervical, thoracic and lumbar injuries, Dr. Chowdhury assessed that each injury was 90% attributable to the October 18, 2002 accident and 10% attributable to the May 2, 2002 accident. Tr. 486. As the ALJ correctly pointed out, this assessment concerned Ho' condition due to two motor vehicle accidents after her date last insured. Tr. 34

The ALJ found that medical reports by treating doctors Drs. Kaur-Jayaram and Chowdhury were "long after the date she was last insured, and are of doubtful relevance." Tr. 34. On the other hand, after questioning the relevance of Dr. Harris' examination for the same reason, the ALJ nonetheless considered it because Ho told Dr. Harris her pain had been a problem for the "past eight years." Tr. 35. The ALJ failed to acknowledge that as treating doctors, Drs. Kaur-Jayaram and Chowdhury also were well-aware of Ho's medical history during 1994 to 1999. The ALJ erred by rejecting the reports of Drs. Kaur-Jayaram and Chowdhury based on their recent date while at the same time accepting Dr. Harris' report despite its recent date. Moreover, "reports containing observations made after the period for disability insurance are relevant to assess the claimant's disability." *Smith v. Bowen*, 849 F2d 1222, 1225 (9th Cir 1988) (citation omitted).

The ALJ also rejected Dr. Chowdhury's medical opinion as "conclusory" and relying on Ho's subjective comments. Tr. 34. However, the totality of Dr. Chowdhury's medical records are far from conclusory and Ho's subjective comments are supported by other treating doctors.

In sum, the ALJ assigned greater weight to the reports of examining physicians than to treating physicians, but failed to provide specific and legitimate reasons for doing so. Where the Commissioner fails to provide adequate reasons for rejecting the opinion of a treating physician, "we credit that opinion as a matter of law." *Hammock v. Bowen*, 879 F2d 498, 502 (9th Cir 1989); *see also Lester*, 81 F3d at 834. Therefore, the opinions of Drs. Ingram, Karu-Hayaram, and Chowdhury must be credited as a matter of law. By crediting those opinions, it is apparent that the ALJ erred when he discredited Ho's testimony as to the severity of her symptoms based on the medical reports.

**III.** **Whether the ALJ Improperly Rejected Treating Doctors' Opinions**

Ho also claims that the ALJ improperly rejected the opinions of her Ho's treating physicians. As explained above in the context of analyzing Ho's credibility, this court agrees. Accordingly, the medical opinions of Drs. Ingram, Karu-Hayaram, and Chowdhury must be credited as a matter of law.

**IV.** **Whether the ALJ Applied Improper Standards for Addressing Vocational Limitations**

The ALJ concluded that Ho could perform a modified range of sedentary work, including working as an order clerk, auto clerk, hand packager or information clerk. Tr. 39. Ho argues that the ALJ erred by disregarding most of her non-exertional limitations, resulting in an invalid RFC and useless VE testimony. Instead, Ho claims that she is unable to maintain concentration, persistence and pace at any job eight hours a day for five days a week.

As discussed above, the ALJ erred by discrediting Ho's testimony concerning the severity of her symptoms and by rejecting the opinions of her treating doctors. Therefore, the RFC by the ALJ is flawed, as is the VE testimony resting on that invalid RFC.

**V.** **Remand for Award of Benefits**

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel,* 211 F3d 1172, 1178 (9th Cir), *cert denied,* 531 US 1038 (2000). The court's decision turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is not sufficient to support the Commissioner's decision. *Rodriguez v. Bowen,* 876 F2d 759, 763 (9th Cir 1989).

The Ninth Circuit has established a three-part test "for determining when evidence should be credited and an immediate award of benefits directed." *Harman,* 211 F3d at 1178. The court should grant an immediate award of benefits when:

> (l) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Id.*

The second and third prongs of the test often merge into a single question: whether the ALJ would have to award benefits if the case were remanded for further proceedings. *See id* at 1178 n7.

The ALJ has failed to provide legally sufficient reasons for rejecting Ho's testimony. If Ho's testimony is credited as true, she suffers from constant pain of around 7 or 8 on a 10-point scale; she is unable to go more than two hours without applying ice to her neck and back; she is unable to sit more than 30-60 minutes and stand more than 10 minutes and even if she alternated sitting for 30 minutes and standing for 10 minutes, she would then flare up at night and might have to be in bed or feel really tired the next one or two days. The VE testified that a person who would be absent from the workplace two or more days a month "basically is considered unemployable and would not be able to sustain work." Tr. 590. The VE also testified that a person who needed to apply ice to her back 15 minutes at a time per hour most days and heat at least once in an eight-hour stretch for about 15 minutes would not be able to work as an order clerk, auto clerk, hand packager or information clerk. Tr. 591. Last, but not least, the VE testified that a person who experiences pain he or she cannot cope with, pain so severe that it

compromises several hours of work per day, causing inability to concentrate and focus on even simple tasks, would find it very difficult to sustain employment. Tr. 592.

Based on both *Harman* and *Benecke*, this court need not return the case to the ALJ to make a new RFC determination. In light of the VE's testimony, combined with the opinions of Ho's treating doctors, the ALJ would have to find Ho disabled if her testimony is credited as true. Moreover, the Appeals Council already remanded the case to the ALJ once for errors in his first opinion. Returning it again to the ALJ would cause further delays, and there is no basis on which the ALJ, after crediting the evidence of Ho's severe pain and serious physical limitations, as well as the medical reports of Ho's treating doctors, could conclude that Ho could perform a different sedentary full-time job. As in *Benecke*, Ho's activities are quite limited and carried out with difficulties, and the record reflects 10 years of various and consistent attempts to manage her pain. Therefore, a remand for further administrative proceedings serves no useful purpose.

## RECOMMENDATION

For these reasons, the Commissioner's decision should be reversed and remanded pursuant to sentence four of 42 USC § 405(g) for the calculation and award of benefits.

///

///

///

///

## SCHEDULING ORDER

Objections to the Findings and Recommendation, if any, are due by February 3, 2006.  If no objections are filed, then the Findings and Recommendation will be referred to a district court judge and go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district court judge and go under advisement.

DATED this 13th day of January, 2006.


s/  Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge